# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 40119 (f rev)**

_____

**UNITED STATES**
*Appellee*

**v.**

**Ervin D. MCCOY**
Airman (E-2), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 12 March 2024

_____

*Military Judge*: Colin P. Eichenberger; Brian M. Thompson (remand).

*Sentence*: Sentence adjudged 1 April 2021 by GCM convened at Vandenberg Air Force Base, California.[1] Sentence entered by military judge on 26 April 2021: Dishonorable discharge, confinement for 2 years, and reduction to E-1.

*For Appellant*: Major Matthew L. Blyth, USAF; Major Alexandra K. Fleszar, USAF.

*For Appellee*: Colonel Steven R. Kaufman, USAF; Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Lieutenant Colonel Meredith L. Steer, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Captain Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, RAMÍREZ, and GRUEN, *Appellate Military Judges*.

Judge RAMÍREZ delivered the opinion of the court, in which Senior Judge ANNEXSTAD and Judge GRUEN joined.

_____

[1] On 14 May 2021, Vandenberg Air Force Base was redesignated Vandenberg Space Force Base.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

RAMÍREZ, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2] The members found Appellant not guilty of a second specification of sexual assault in violation of Article 120, UCMJ, against the same victim. The panel sentenced Appellant to a dishonorable discharge, confinement for two years, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence.

Appellant raised eight issues on appeal, which we reword as follows: (1) whether Appellant's sexual assault conviction is factually sufficient; (2) whether the military judge abused his discretion concerning Mil. R. Evid. 404(b) evidence; (3) whether the circuit trial counsel engaged in improper argument; (4) whether the military judge erred when he denied a defense request to instruct on a unanimous verdict; (5) whether the convening authority erred when he denied a deferment request Appellant did not request, but did not address Appellant's suspension request; (6) whether the convening authority had jurisdiction over Appellant; (7) whether Appellant's sexual assault conviction is legally sufficient; and (8) whether the record of trial's omission of the trial audio is a substantial omission warranting relief.[3]

This case is before us a third time. Concerning Issue (8), on 31 October 2022, this court returned the record of trial to the military judge pursuant to Rule for Courts-Martial (R.C.M.) 1112(d) because the disc containing the audio recording from Appellant's trial was missing from the record. *United States v. McCoy*, No. ACM 40119, 2022 CCA LEXIS 632, at *3 (A.F. Ct. Crim. App. 31 Oct. 2022) (order).[4] On 5 December 2022, the case was re-docketed with our court, and now contains the previously missing audio. Therefore, we find this

_____

[2] All references in this opinion to the UCMJ, the Military Rules of Evidence (Mil. R. Evid.), and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] Issues 6, 7, and 8 are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] We note the remand order had a scrivener's error incorrectly identifying the date of docketing as 6 July 2022; the correct date is 6 July 2021.

issue has been resolved. On 9 November 2023, we remanded the case a second time to address Issue (5), as we found the convening authority failed to properly consider and act on Appellant's suspension request. *United States v. McCoy*, No. ACM 40119, 2023 CCA LEXIS 476, at *5 (A.F. Ct. Crim. App. 9 Nov. 2023) (unpub. op.). We returned jurisdiction over the case to a detailed military judge and dismissed the appellate proceeding consistent with Rule 29(b)(2) of the Joint Rules for Appellate Procedure for Courts of Criminal Appeals. *Id.* at *7. The case was re-docketed with this court for a second time on 21 December 2023, after the convening authority considered and acted on Appellant's suspension request. Following the remands, Appellant filed a third brief with the court submitting his case on its merits with no additional specific assignments of error but preserving and maintaining those assignments of error raised in his initial brief. Further, Appellant conceded that Issues (5) and (8) were now moot.

As to Appellant's fourth issue, the United States Court of Appeals for the Armed Forces decided the case of *United States v. Anderson*, which held that a military accused does not have a right to a unanimous verdict under the Sixth Amendment, the Fifth Amendment's due process clause, or the Fifth Amendment's component of equal protection.[5] 83 M.J. 291, 302 (C.A.A.F. 2023), *cert denied*, No. 23-437, 601 U.S. __ (20 Feb 2023). Therefore, Appellant is not entitled to relief for this issue.

After considering the five remaining issues, addressing the first and seventh issues together in this opinion, we find no error materially prejudicial to Appellant's substantial rights and affirm the findings and sentence.

## I. BACKGROUND

In March 2019, after completing technical training school, CS arrived at Vandenberg Air Force Base (AFB), California, which was his first duty station. Appellant and CS[6] were part of the same friend group at Vandenberg AFB and assigned to the security forces squadron.

In September 2019, the friend group, to include Appellant, was at a flight function and invited CS to go to Las Vegas, Nevada, for the weekend with them. They planned to leave for Las Vegas within the hour, and CS agreed to go. Prior to this trip to Las Vegas, CS and Appellant had never spent any time alone with each other. The group of five Airmen, made up of three men (Appellant, CS, and Senior Airman (SrA) GM) and two women, all rode in

---

[5] U.S. CONST. amends. V, VI.

[6] CS was an enlisted active-duty member of the United States Air Force.

Appellant's car. In Las Vegas, the men and women stayed in separate houses.[7] CS and SrA GM slept on a couch in the living room and Appellant slept in a bedroom. CS testified at trial that going into this Las Vegas trip he was not sexually interested in Appellant.

After arriving, the group went to the Las Vegas strip to drink. They spent between two and three hours there, however, only CS and Appellant were drinking. CS had about four drinks that night but did not feel intoxicated. CS and Appellant were communicating by Snapchat. CS explained that most Snapchat messages disappear unless they are specifically saved.

While they were on the Las Vegas strip, Appellant told CS that he wanted to have sex with somebody that night and offered CS oral sex. CS testified that he told Appellant, "no thanks" and, "I am good. I'm just going to go to bed." CS testified that when they got back to the house where they were staying, Appellant sent CS a Snapchat message again offering him oral sex. CS again declined.

The next morning, CS "didn't want to make the trip awkward," so he had a conversation with Appellant about Appellant's comments. CS told Appellant that oral sex from him is not something he was interested in, and they "were just gonna not talk about it and just continue on with the trip." That day, the group drove to the Hoover Dam where, similar to their previous interactions, CS and Appellant did not spend one-on-one time together. After the Hoover Dam, the group went to a swimming pool, but again, CS and Appellant did not spend one-on-one time together.

That same night, the group went to Fremont Street area of Las Vegas, where CS and Appellant drank a lot of alcohol. CS explained, "I was stopping at every bar I saw to get a drink." CS was drinking "Vegas Bomb[s] and Jaeger Bombs." Appellant was "going drink for drink with" CS. At some point in the evening CS's memory started to get hazy and progressed to him having no memory of the rest of the night on Fremont Street, getting back to the house, or being at the house. CS's next memory is being on the couch where he had slept the night before and Appellant "laying between [CS's] legs . . . [while CS] was laying on [his] back and [CS's] penis was in [Appellant's] mouth." CS also remembered feeling Appellant's beard on his legs and Appellant showing CS male/female porn on his phone and telling CS that "it would help." CS felt nauseated and "just wanted [it] to stop." CS testified that he could only recall "30 seconds to a minute" of that encounter.

---

[7] SrA GM's aunt and a great aunt live in the area and agreed to host the Airmen in their homes.

At trial, circuit trial counsel asked CS if he tried to get away and he answered, "I believe I pushed on his head," but did not recall if anything happened. CS was also asked if he ever gave Appellant his "freely given agreement to give [him] oral sex," and CS answered, "No." CS was then asked, "[D]o you have any reason in your mind to believe that for the parts of that night you don't remember that you, in fact, gave [Appellant] the freely given agreement to give you a blowjob?" CS rejected that possibility by responding, "No," and explained that he was so confident in his answer because he is "not interested in men at all."

CS testified that the next morning he looked at his phone and had a Snapchat message from Appellant that read, "You are messed up," and it contained a picture of Appellant curled up on the couch in his underwear. CS also testified that Appellant sent CS another Snapchat message which read, "Please don't hold this against me. I am not me when I am drunk." CS contacted his supervisor and his father on the drive back home and ultimately decided to report the sexual assault.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of his conviction for sexual assault and provides the court with two arguments. First, Appellant argues that lack of consent was not proven. Second, Appellant suggests that we "should look skeptically at CS's credibility." We disagree with Appellant's arguments and find no relief is necessary.

#### 1. Additional Background

SrA KE, a friend of Appellant, testified. She was one of the individuals that went to Las Vegas with the group and knew CS from work. She testified that Appellant had an interest in straight or straight-acting guys because he liked the challenge of it. SrA KE explained that on the first night and the second night in Las Vegas, both Appellant and CS were intoxicated. One of the things that she saw, while on Fremont Street, was Appellant meeting with a guy he met on Grindr.[8] She testified that Appellant "went up to the guy that he met on Grinder [sic] . . . and [she] just didn't expect him to do that, and it was just like all of a sudden. There was no real talk about him doing it." While Appellant was with the guy from Grindr, CS was asking about Appellant's whereabouts. It was "assumed that [CS] was just worried about where [Appellant] was at because he didn't want him to get hurt."

---

[8] SrA KE explained that Grindr is "an app where . . . people of gay orientation meet each other to hook[ ]up."

5

At another point in the night while on Fremont Street, Appellant and CS walked down the street holding hands and were joined by SrA GM also holding their hands. CS initiated the hand holding. One of the friends made a video of the three males holding hands and it was presented to the panel as evidence.

The group decided to leave Fremont Street between 0300 and 0400 hours. Their car was parked in a garage. In the garage, CS urinated off the side of the parking garage, got in the car, fell asleep, started snoring, and later vomited in his mouth. Once they started driving back to the house, CS vomited again, this time all over the car. The group decided to go to a 24-hour car wash to clean the inside of the car. At the car wash, CS was by himself, not talking to anyone, and resting his head on the car. SrA GM described CS in the car, as intoxicated, initially looking "drowsy, just a little out of it," and then "knocked out."

Once they got back to where they were staying, SrA KE left the car and walked to the house where the women were staying. She did not know if CS needed help walking into the men's house. However, SrA GM testified that CS did not need help walking to the house. SrA GM did not stay in the house for very long because he went to meet SrA KE. When he got back to the house where the men were staying, SrA GM "saw [CS] belly down on the couch. He was shirtless, did not have his pants on, and then [he] saw . . . [Appellant] relaxing on the other part of the couch with a beer in his hand." Appellant asked SrA GM if everything was okay, but SrA GM did not want to talk. Appellant then walked to the room where he was staying and closed the door. SrA GM testified that CS's shorts were folded on a chair.

The next day, on the drive back to their duty station, CS told SrA KE, via Snapchat, what had occurred the night before with Appellant. After he told her, SrA KE saw CS silently crying in the seat next to her. At one point on the drive back, the group stopped at a gas station and CS used that time to tell SrA GM about the sexual assault.

CS was wearing a football shirt, underwear, and shorts the night of the sexual assault. He provided the underwear to the Air Force Office of Special Investigations (AFOSI) for processing. AFOSI then sent it to the United States Army Criminal Investigative Laboratory for DNA testing. At trial an expert in the field of forensic biology and DNA analysis testified that the DNA profile from the underwear was a mixture of two individuals, CS and Appellant.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder

could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted). As we resolve "questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, . . . [we are] convinced of the . . . [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. We take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make . . . [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. As an evidentiary standard, proof beyond a reasonable doubt does not require more than one witness to credibly testify. *See United States v. Rodriguez-Rivera*, 63 M.J. 372, 383 (C.A.A.F. 2006) (finding that the testimony of a single witness may satisfy the Government's burden to prove every element of a charged offense beyond a reasonable doubt) (citations omitted).

To find Appellant guilty of sexual assault, in violation of Article 120, UCMJ, the court members were required to find the following elements beyond a reasonable doubt: (1) Appellant committed a sexual act upon CS (causing contact between Appellant's mouth and CS's penis) and (2) Appellant did so without CS's consent. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d).

"Consent" is defined as

> a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent. Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent. All the surrounding circumstances are to be considered in determining whether a person gave consent.

*MCM*, pt. IV, ¶ 60.a.(g)(7).

As it relates to consent, "the Government need not prove an appellant intended the alleged sexual contact to be without consent." *United States v. Rodela*, 82 M.J. 521, 526 (A.F. Ct. Crim. App. 2021) (citation omitted).

Similarly, "[t]he burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent." *United States v. McDonald*, 78 M.J. 376, 381 (C.A.A.F. 2019).

Mistake of fact as to a victim's consent is an affirmative defense to the offense of sexual assault. *McDonald*, 78 M.J. at 379. If an accused holds, based on ignorance or mistake, an incorrect but reasonable belief that the victim consented, the accused is not guilty of the offense of sexual assault. *See* R.C.M. 916(j)(1) ("[The] mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances.") There must be some evidence of the mistake of fact for the military judge to instruct the panel. *United States v. DiPaola*, 67 M.J. 98, 100 (C.A.A.F. 2008) (quoting *United States v. Hibbard*, 58 M.J. 71, 72 (C.A.A.F. 2003)).

### 3. Analysis

Appellant argues the element of lack of consent was not proven beyond a reasonable doubt and that CS is not credible. As outlined below, we disagree.

Here, the evidence supports a finding that Appellant committed a sexual act upon CS by placing his mouth on CS's penis during the early morning hours of 8 September 2019 and that it happened without CS's consent. A review of the evidence shows the following: Appellant offered CS oral sex the night prior to the sexual assault. CS said no. Appellant sent CS a Snapchat message offering oral sex. CS said no. This shows Appellant's desire to perform oral sex on CS and CS's lack of consent going into the day of the assault. On the night of the assault, CS consumed so much alcohol that he fell asleep and vomited in Appellant's car. While no witness was able to testify at what point CS fell asleep on the couch, the evidence supports that CS did not wake up until Appellant's mouth was on CS's penis. The evidence also supports that Appellant was showing CS male/female pornography on his phone while performing oral sex on CS, and that CS tried to push Appellant's head away. Finally, the evidence supports that Appellant apologized to CS for his conduct when he sent CS a Snapchat picture of CS curled up on the couch in his underwear and a Snapchat message which read, "Please don't hold this against me. I am not me when I am drunk."

Having given full consideration to Appellant's arguments that lack of consent was not proven and drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction as a rational factfinder could have found all the essential elements of Appellant's convicted offense beyond a reasonable doubt.

We also address each argument Appellant raises and ask ourselves if we are convinced of Appellant's guilt beyond a reasonable doubt.

Appellant does not contest the DNA results. He concedes that he performed oral sex on CS. Instead, in his brief before this court, Appellant claims that "[b]oiled down to its essence, the Government's evidence on the key question, consent, amounts to CS's statement at trial that he was not interested in men. Nothing in the record supports this statement except his own declaration." However, Appellant acknowledges CS testified that he believed he attempted to push Appellant's head away from his penis. Nonetheless, he questions this because CS only testified about this at trial. Appellant claims the "potential that [CS] consented . . . is inconsistent with his self-image." As explained below, however, a fresh, impartial look at the evidence points in a different direction.

Upon review of the evidence, we do not have a basis to question CS's credibility. Had CS consented but decided it was a bad idea the next morning, it would make little sense to tell his friends, his supervisor, and his father that he was sexually assaulted. We find CS credible when he testified that he did not have a sexual interest in Appellant. While we do not know what happened before CS woke up on the couch, we know that CS had already turned Appellant down twice, even after consuming alcohol. We find credible CS's testimony that he attempted to push Appellant's head away. While Appellant argues that CS had not mentioned the push before trial and while challenged at trial, the testimony itself is uncontroverted. We also find Appellant's apology for his conduct is some evidence as to his consciousness of guilt.

Finally, we note the military judge instructed on mistake of fact, but Appellant does not argue on appeal that he was mistaken as to consent. Instead, he simply states, "Given the limited evidence produced, the Government failed in its burden to prove CS did not consent, or to disprove whether [Appellant] had a reasonable mistake of fact as to consent." Appellant offers no evidence that would support he had an honest and reasonable belief that CS consented to the sexual act. The only evidence discussed by the Defense at trial as to mistake of fact was the hand-holding incident on Fremont Street. However, we are unpersuaded that Appellant holding hands in public with two men demonstrates consent to oral sex from one of the men. As our superior court has explained, consent to kissing or "'making' out is simply not comparable to sexual intercourse." *United States v. St. Jean*, 83 M.J. 109, 114 (C.A.A.F. 2023). Similarly, consent to holding hands is simply not comparable to consent to oral sex.

We have made allowances for not having personally observed the witnesses, we have weighed the evidence in the record of trial, we have considered the minor inconsistencies as argued by Appellant, and we are convinced of Appellant's guilt beyond a reasonable doubt. Accordingly, we find his conviction factually sufficient.

**B. Mil. R. Evid. 404(b) Evidence**

Appellant claims that the military judge abused his discretion in admitting evidence under Mil. R. Evid. 404(b) that Appellant enjoyed the challenge of trying to engage in sexual activity with straight men. Specifically, Appellant contends that the military judge committed reversible error in (1) determining that the underlying act actually occurred, (2) that there were non-propensity uses of the evidence, and (3) that the probative value was not substantially outweighed by the danger of unfair prejudice.

**1. Additional Background**

During the discovery phase of Appellant's court-martial, the Government provided trial defense counsel written Mil. R. Evid. 304(d) notice that it might elicit statements made to various members of the group trip to Las Vegas that Appellant "was turned on by trying to 'turn' straight guys, that he enjoyed the challenge, and that this was a sexual fetish of his."

During the Government's opening statement, the Defense objected to comments explaining that Appellant had a sexual fetish. The military judge addressed the issue of admissibility of this evidence in a hearing outside the presence of the panel, and sustained the objection.

After CS testified, the parties again raised this issue with the military judge. The Defense agreed that Appellant made the statements at issue, and agreed that SrA KE and SrA JG would testify consistent with the Government's notice. After the military judge gave both sides an opportunity to argue the admissibility of this evidence, he ruled from the bench. The military judge stated that he was analyzing the evidence under Mil. R. Evid. 404(b) "because the evidence offered by the Prosecution are statements of [Appellant] wherein [Appellant] discussed his sexual enjoyment in committing specific acts[, m]ainly the act of enticing straight men to engage in homosexual conduct." The military judge found that the "Prosecution is not introducing a character trait nor eliciting testimony in a form of an opinion or reputation that [Appellant] possesses a particular character trait."

The military judge then analyzed the evidence pursuant to the three prongs our superior court laid out in *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989).[9]

As to the first prong, the military judge found that both the Prosecution and Defense agreed that Appellant made the statements to his friends "that

---

[9] The three prongs in *Reynolds* are whether: (1) the evidence reasonably supports a finding by the fact finder that the appellant committed prior crimes, wrongs, or acts; (2) a fact of consequence is made more or less probable by the existence of the evidence; and (3) the probative value is substantially outweighed by the danger of unfair prejudice. 29 M.J. at 109.

he was turned on by trying to turn straight guys, and that he enjoyed the challenge." The military judge found that the "testimony, if believed, is sufficient for a reasonable fact finder to conclude that [Appellant] made those statements *and committed the prior acts detailed in the statements*. Specifically, that on previous occasions, [Appellant] attempted to entice straight men into engaging in homosexual acts with him." (Emphasis added.)

As to the second prong, the military judge found that "[t]he fact of consequence made more probable by this evidence is [Appellant's] motive in engaging in the charged conduct, and the fact of consequence made less probable is that [CS] initiated the sexual acts at issue." As to the issue of motivation, the military judge identified that facts had been presented during the court-martial that CS identified as a straight male. During his ruling the military judge stated:

> [Mil. R. Evid.] 404(b) evidence would have a tendency to show that despite the fact that [CS] identified as straight, and [Appellant] would have known he was straight, [Appellant] would still have a sexual interest in [CS], would still have an interest in pursuing him sexually, and in fact, would be motivated and potentially more motivated to pursue [CS] sexually by the enjoyment he found in overcoming such a challenge.

With regards to initiation, the military judge identified testimony that CS "was in a blackout, drunken stage at the time of the offense," that CS "had been blackout drunk before," and that CS "was aware on prior occasions of blackout that he had initiated activities on his own violation [sic] which were outside of his normal character . . . ." Additionally, the military judge made the findings that after the alleged sexual assault, CS's "clothing was neatly folded near an area where he was sleeping, that he is a large individual and would have been difficult to undress without his cooperation and that it was possible that he had engaged in a number of actions indicative of consent, which he did not recall." Based on these findings, the military judge concluded that the

> evidence that [Appellant] enjoyed pursuing straight men would tend to rebut the implication gleaned from that evidence that [CS] may have been the one who initiated the sexual activity during his blackout, because the evidence would demonstrate [Appellant's] sexual interest in pursuing [CS] and the likelihood that he initiated the sexual interaction.

As to the third prong the military judge found that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. He found the probative value of this evidence "strong, as the

evidence indicates both a motive from [Appellant] and refutes an implication that [CS] initiated the sexual acts." The military judge specifically found that the evidence would not "paint [Appellant] as a sexual predator." Additionally, the military judge found that "[n]othing about the statements indicate at all that [Appellant] enjoyed [ ] engaging in unwanted sexual acts with unwilling participants, but only that [Appellant] enjoyed the challenge of gaining consent from straight men for sexual activity." The military judge specifically found "nothing criminal about such an act or interest," that the "evidence does not paint [Appellant] as a bad person," and that "[t]here is nothing inherently bad about pursuing someone of a different sexual orientation."

Finally, the military judge noted that an appropriately tailored instruction would be sufficient to overcome any potential unfair prejudice related to this evidence.

### 2. Law

A military judge's rulings under Mil. R. Evid. 404(b) and Mil. R. Evid. 403 will not be disturbed except for a "clear abuse of discretion." *United States v. Morrison*, 52 M.J. 117, 122 (C.A.A.F. 1999) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997)). "A military judge abuses his or her discretion when: (1) the military judge predicates a ruling on findings of fact that are not supported by the evidence of record; (2) the military judge uses incorrect legal principles; (3) the military judge applies correct legal principles to the facts in a way that is clearly unreasonable; or (4) the military judge fails to consider important facts." *United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022) (citations omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)). "The standard requires that the military judge be clearly wrong in his determination of the facts or that his decision be influenced by an erroneous view of the law." *United States v. Dooley*, 61 M.J. 258, 262 (C.A.A.F. 2005) (footnote omitted). "When testing for an abuse of discretion, this [c]ourt does not substitute its judgment for the military judge's." *United States v. Grant*, 38 M.J. 684, 688 (A.F.C.M.R. 1993).

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Mil. R. Evid. 404(b)(1). However, this same evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Mil. R. Evid. 404(b)(2). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989) (footnote omitted).

Military judges apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b): (1) whether the evidence reasonably supports a finding that Appellant committed other crimes, wrongs, or acts; (2) whether the evidence of the other act makes a fact of consequence to the instant offense more or less probable; and (3) whether the probative value of the evidence of the other act is substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403. *Reynolds*, 29 M.J. at 109 (citations omitted). "If the evidence fails to meet any one of these three standards, it is inadmissible." *Id*.

Statements, themselves, can qualify as MRE 404(b) evidence. See, e.*g., United States v. Franklin*, 35 M.J. 311, 318 (C.M.A. 1992) (finding appellant's prior statement, "did you ever wonder what it would be like to kill a b*tch," was admissible under Mil. R. Evid. 404(b) in prosecution for murder because "the statement was relevant to establish appellant's intent to kill and was not unduly prejudicial").

### 3. Analysis

Appellant claims that the military judge erroneously conflated the statements at issue with the underlying conduct described in the statement. We disagree.

We find the military judge's fact-finding on the first *Reynolds* prong was supported by the evidence of record. That the statements were made was not in issue; both the Prosecution and the Defense agreed that witnesses would testify Appellant made the statements. Having found a reasonable fact finder could conclude Appellant made statements to friends that he had enticed straight men to engage in homosexual conduct, it was not inappropriate for the military judge to determine that a reasonable fact finder could conclude that Appellant actually committed the prior acts detailed in those statements. Thus, we conclude that the military judge properly applied the first *Reynolds* prong.

We also find the military judge correctly applied the second *Reynolds* prong. The facts of consequence in this litigated case included who had the motive or intent to engage in the sexual act and who initiated the sexual act at issue. As such, the military judge was not incorrect in his finding that the fact of consequence made more probable by this evidence was Appellant's motive in engaging in the charged conduct, and the fact of consequence made less probable is that CS initiated the sexual acts at issue.

As to the third *Reynolds* prong, we find the military judge properly applied the Mil. R. Evid. 403 balancing test. We find no error in the military judge's conclusion the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Here, the military judge found

that the probative value was "strong" as it indicates both a motive from Appellant and refutes an implication that CS initiated the sexual acts. The military judge also acknowledged the risk of unfair prejudice was low, as the statements at issue did not portray Appellant as someone who enjoyed engaging in unwanted sexual acts with unwilling participants. Rather, these statements show that Appellant enjoyed the challenge of gaining consent from straight men for sexual activity.

We conclude that the military judge properly applied the *Reynolds* test, and his ruling was not an abuse of discretion. Accordingly, we hold that the military judge did not commit error in admitting the evidence. We further note that the military judge provided the panel a proper limiting instruction.

## C. Circuit Trial Counsel's Closing Argument

Appellant claims that circuit trial counsel engaged in "improper argument," by (1) misstating the law to the members; (2) impermissibly exceeding the scope of Mil. R. Evid. 404(b) evidence; (3) improperly using gender-based hypotheticals; and (4) arguing the members should convict Appellant to "give meaning to [CS's] year."

### 1. Additional Background

In support of his claims, Appellant points to selections of circuit trial counsel's closing argument and rebuttal argument. We have included the full paragraphs and italicized the specific portions with which Appellant takes issue.

For his first claim, that the argument misstated the law, Appellant points to the following:

> Members, you were presented with one set of facts in this case, *but two very different understandings of the law*. On one hand, you've been presented with the Defense's view and that is, if someone drinks to the point that they pass out on a couch, fall asleep, fall asleep in the back of a car, vomit repeatedly, that if that person can't remember a portion of the evening, that they cannot be sexually assaulted. That in other words, *unless you have an eyewitness, there can be no conviction*.

> On the other hand, is *the Government's view which is the law*, which states, and we'll talk about some of the judge's instructions shortly, *that you are not stuck with just throwing up your hands and going, "Well, there's no eyewitness, therefore, I cannot convict."*

> That is not the law, [m]embers. What the military judge instructs you in this case is that you must take into account all

of the evidence to determine whether there was consent, and what we know from this case, what we know from Friday night, what we know from Saturday night, what we know from Sunday morning is not that all of a sudden [CS] completely changes his personality and is interested in [Appellant]. There is not a shred of evidence. Not a shred.

. . . .

. . . The military judge at no point tells you and the law does not require, *what the Defense has invited you to do in this case, which again, is to throw up your hands* and say, "Well, if someone is *that drunk, I cannot convict.*" It's not the law.

. . . .

Number one, [Appellant] must get consent from a sexual partner. That is relatively obvious. The law does not conflict with your common sense. Someone who wants to engage in sexual activity must get consent from their partner. In other words*, it's not [CS's] job to say, "No." It was [Appellant's] job to make sure that he says, "Yes."* That there is, in fact, consent, and the judge's instruction on consent makes that very clear. He defines consent as a freely given agreement to the conduct at issue by a competent person. *Someone who*, when propositioned, someone who *when asked say, "Yes," and in a way that makes it clear to everyone in that encounter that the answer is actually yes. "Yup, I understand what's going on and I am down for this."* That's what the law requires, and it is on [Appellant] to make sure that that happens.

The judge additionally instructs you that an expression of lack of consent or conduct means there is no consent. In other words, when you heard, [m]embers, that Friday night *when [CS] said, "Thank you, but that's not something I'm interested in at all," that was the rule going forward unless there was something clear that contradicted that.* And you heard nothing like that. Nothing. You see, [CS] did what we would hope an Airman [would do] in the situation that he was confronted with. "I appreciate the compliment, [Appellant], but why don't we just forget that happened and have a good weekend." And that's exactly what you saw [CS] do for the rest of that weekend. "No, thank you. I'm not interested. But let's still have a good time."

. . . .

> *Consent means [Appellant] needed to ask [CS],* get permission from [CS], *"Hey, you said no already. Do you want me to do this?" And had to have done it with someone, right, where in [Appellant's] mind it's obvious that everyone is on the same page.*

(Emphasis added).

For his second claim, that the circuit trial counsel impermissibly exceeded the scope of Mil. R. Evid. 404(b) evidence, Appellant points to the following:

> Members, *consider from [Appellant's] perspective*, then, *what life was like going into Saturday*. Because this is what [Appellant] was thinking about, and the military judge gives you this instruction. "*You may consider evidence that [Appellant] told [SrA KE] that he enjoyed engaging in sexual activity with straight men, and enjoyed the challenge of straight men for the purpose, if any, to determine whether [Appellant] had a motive to engage in the charged conduct.*"
>
> In other words, on Friday night when [CS] shot him down, here was the *challenge*. This was *the fun*. This was *to see if whether Saturday night, [CS] would get drunk enough so that what [Appellant] was interested in very openly with his friends, liking trying to turn straight men, would pan out*. And so ask yourself, other than alcohol, other than alcohol, what changed between Friday and Saturday night?
>
> . . . .
>
> What happened, [m]embers, is clear from the evidence, clear from, if nothing else, the layout of this house, that this was an opportunity. It was *an opportunity for [Appellant] to do what he had an interest in, which was to at that point take advantage of [CS]. Put another tally on his belt. Put another trophy on his shelf, and it didn't take much, [m]embers.*

For his third claim, that the circuit trial counsel improperly argued gender-based hypotheticals, Appellant points to the following argument:

> And, [m]embers, I encourage you to *think about when you are back in deliberations, if this were a male on female sexual assault whether we would even be talking about some of the silly things that you've heard in this courtroom*. If this were a male on female sexual assault, does anyone reasonably think that being in a hot tub with someone, not touching, not sitting on each other's lap, but being in a hot tub with Uncle Frank means that you want to have sex with that person, or is it *simply because the victim is a*

*male in this case we're going to treat him differently? That unless they are 12 feet or more from each other, there must be consent or reasonable mistake of fact as to consent. How insulting. How insulting.*

You also heard that early on at Fremont Street, this much vaunted handholding. Members, just look at the video. Just look at the video, because what happened in that video, you can watch it for yourself, is that [Appellant] is standing in the middle of [CS] and [SrA GM], and the Defense wants to make a lot of hay out [of] this. Well, it was [CS] that grabbed his hand first. . . . No one thought it was sexual, not [Appellant], no one. They were swinging their arms around acting like idiots. Having fun. Exactly what [CS] promised he would do. Overlook the weirdness from the night before and just move on. To try to make that sexual, to try to get out of these witnesses and force the Government to give you a video showing you what actually happened. There is nothing that is sexual about that encounter whatsoever, and again, *if that were a woman, to say that they briefly held hands and swung their arms around acting like fools, that that somehow amounts to consent to sex is insulting to your intelligence and understanding of the common sense and knowledge of the ways of the world.*

. . . .

. . . There is nothing else at Fremont Street that indicates that [CS] was all of a sudden sexually interested in [Appellant]. What? That they drank together because of the two of them were of drinking age? Ask yourself, if it were a female victim, *would you accept that a male and a female drinking together is evidence that they want to have sex? How insulting.*

(Emphasis added).

For his fourth claim, that the circuit trial counsel impermissibly argued that the members should convict Appellant to "give meaning to [CS's] year," Appellant points to the following:

[Circuit Trial Counsel (CTC)]: And so [CS], and being honest with you, gave to you the people that know more than almost anyone else in this world what actually happened in that house. *Leaves to you the charge of doing the right thing, to give meaning to his year and to convict [Appellant].*

[Circuit Defense Counsel]: Objection, that's an improper argument.

> [Military judge]: Overruled. You may continue, [circuit] [t]rial [c]ounsel.
>
> [CTC]: And based on what you know, what you've heard, and what you've seen, to convict [Appellant] of what he's done.

(Emphasis added).

At the end of circuit trial counsel's closing arguments, the military judge gave the panel members a recess, but before doing so, gave the following instruction:

> Before we go on that recess, I do want to give you just a couple of reminders. Counsel for both sides may refer to the instructions that I have given you, but as a reminder, to the extent that any of their reference differs from the instructions that I gave you, you must accept my statement as being correct. You will be provided a written copy of the instructions in this case.
>
> As a reminder, consent means a freely given agreement to the conduct at issue by a competent person. There are no specific actions that are required to demonstrate consent. All the surrounding circumstances are to be considered in determining whether a person gave consent.

**2. Law**

The issue of "[i]mproper argument is a question of law that we review de novo." *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011) (citation omitted). However, if the defense does not object to the argument by trial counsel, we review the issue for plain error. *Id.* (citing *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007)). To establish plain error, an appellant "must prove that: '(1) there was an error; (2) it was plain or obvious; (3) and the error materially prejudiced a substantial right.'" *Id.* (quoting *Erickson*, 65 M.J. at 223). "As all three prongs must be satisfied in order to find plain error, the failure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006). "Appellant has the burden of persuading this Court that there was plain error." *United States v. Barraza[ M]artinez*, 58 M.J. 173, 175 (C.A.A.F. 2003) (citation omitted).

When preserved by objection, this court reviews allegations of improper argument for an abuse of discretion. *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted).

"In his arguments, trial counsel may strike hard blows, but he is not at liberty to strike foul ones." *Id.* (alteration, internal quotation marks, and citation omitted). Trial counsel may "argue the evidence of record, as well as

all reasonable inferences fairly derived from such evidence." *Id.* (citation omitted). "He may not, however, inject his personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *Id.* (citations omitted).

"Relief will be granted only if the trial counsel's misconduct 'actually impacted on a substantial right of an accused (i.e., resulted in prejudice).'" *United States v. Frey*, 73 M.J. 245, 249 (C.A.A.F. 2014) (citation omitted). "In assessing prejudice, we look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005) (citation omitted). *Fletcher* set out three factors to weigh in the determination of the prejudicial effect of improper argument: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Id.* "In other words, prosecutorial misconduct by a trial counsel will require reversal when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Id.*

Finally, "the argument by a trial counsel must be viewed within the context of the entire court-martial." *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F 2000). Thus, "[t]he focus of our inquiry should not be on words in isolation, but on the argument as viewed in context." *Id.* (internal quotation marks and citations omitted).

### 3. Analysis

#### a. Misstating the Law

As there was no objection, we review this claim for plain error.

Appellant first contends that trial counsel's argument attacked a "straw man argument" that trial defense counsel had not made. However, Appellant cites no legal authority as to why this is error and we conclude that it is not. When we view circuit trial counsel's argument in context, we read it as countering Appellant's defense at trial that CS's memory or lack of memory could not be trusted and that the panel should disregard CS's testimony as to lack of consent. "Under the 'invited response' or 'invited reply' doctrine, the prosecution is not prohibited from offering a comment that provides a fair response to claims made by the defense." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citations omitted).

Next, Appellant argues that when circuit trial counsel told the panel members that CS had to say "yes," what he really meant was that it was a "verbal" yes. We disagree. What circuit trial counsel said after that was:

"[S]omeone who, when propositioned, someone who when asked say[s], 'Yes,' and in a way that makes it clear to everyone in that encounter that the answer is actually yes." We read circuit trial counsel's argument as just that, argument, and we do not read this as an argument requiring a verbal "yes," but action that would reflect an affirmative response to both individuals involved, not a literal or verbal "yes, I consent." However, even if circuit trial counsel's argument can be read to require the word "yes," the military judge's curative instruction after circuit trial counsel's closing argument cured any prejudice.

Finally, Appellant contends that circuit trial counsel improperly shifted the burden of proof to Appellant when he argued, "[c]onsent means [Appellant] needed to ask [CS], get permission from [CS], 'Hey, you said no already. Do you want me to do this?' And had to have done it with someone, right, where in [Appellant's] mind it's obvious that everyone is on the same page." While we do not conclude that Appellant needed to use those words or any magic words to obtain consent, this goes to the instruction that the military judge provided. The military judge instructed the members that "consent means a freely given agreement to the conduct at issue by a competent person. There are no specific actions that are required to demonstrate consent. All the surrounding circumstances are to be considered in determining whether a person gave consent." Additionally, the military judge instructed the members that it was the Government's burden to prove that the sexual acts occurred without consent. Here, Appellant does not demonstrate how the burden was shifted and we do not find that that circuit trial counsel was telling the members that that Appellant had to literally use those or any specific words. We also do not agree that circuit trial counsel was telling the panel that Appellant was required to testify.

Upon considering circuit trial counsel's argument viewed within the context of the entire court-martial and not looking at the words in isolation, we conclude that Appellant has not met his burden in persuading this court that there was error. Because he does not meet the first plain error prong, we do not reach the other two. *See Bungert*, 62 M.J. at 348. ("As all three prongs must be satisfied in order to find plain error, the failure to establish any one of the prongs is fatal to a plain error claim.").

### b. Exceeding the Scope of 404(b) Evidence

As there was no objection, we review this claim for plain error.

Here, Appellant does not attack the words that circuit trial counsel used, but the inference that Appellant draws from the words. Appellant argues that the first inference is that Appellant "supplies straight men with alcohol and then takes advantage of them when they are incapacitated." However, as

Appellant points out, he was charged with two specifications of sexual assault, including one which alleged CS was asleep. Therefore, even assuming this was error, and that it was plain or obvious, we cannot find that the claimed error materially prejudiced a substantial right when the panel found him not guilty of the "asleep" specification. Put another way, Appellant cannot show a reasonable probability that he would not have been convicted in the absence of these arguments.

Appellant contends that the next inference concerns propensity when circuit trial counsel argued:

> What happened, [m]embers, is clear from the evidence, clear from, if nothing else, the layout of this house, that this was an opportunity. It was an opportunity for [Appellant] to do what he had an interest in, which was to at that point take advantage of [CS]. Put another tally on his belt. Put another trophy on his shelf, and it didn't take much, [m]embers.

We do not see this as a propensity argument because Mil. R. Evid. 404(b) specifically allows evidence as it relates to opportunity and motive. The military judge properly allowed this evidence in and could have allowed this evidence for several reasons, including motive. An appellate court may affirm the decision of a trial court on the theory it articulated "or on any other basis that we find in the record." *Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York*, 346 F.3d 264, 267 (2d Cir. 2003) (citation omitted); *see also United States v. Bess*, 80 M.J. 1, 11–12 (C.A.A.F. 2020) (citations omitted) (discussing the upholding of a trial judge's decision on appeal for a different reason).

That said, we are concerned with the small portion of the argument in which circuit trial counsel argues that "[i]t was an opportunity for [Appellant] to do what he had an interest in, which was to at that point take advantage of [CS]. Put another tally on his belt. Put another trophy on his shelf . . . ." While we do not see this as propensity evidence, we think it is a close call. Assuming *arguendo* that these statements constituted improper argument, we test for prejudice.

In testing for material prejudice, the first *Fletcher* factor considers the severity of the misconduct. 62 M.J. at 184. On this matter, we note that the "lack of a defense objection is some measure of the minimal impact of a prosecutor's improper comment." *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (internal quotation marks and citation omitted). Here, we find that the comment was minor. The comment was isolated, not the gravamen of trial counsel's argument, and surrounded by appropriate argument. We find the comment had minimal impact, if any, on the findings.

Regarding the second *Fletcher* factor, curative measures taken, there were none. As mentioned above, trial defense counsel did not object and the military judge did not *sua sponte* draw attention to this one sentence in the argument.

As to the third *Fletcher* factor, the weight of the evidence supporting the conviction, we find this factor weighs in the Government's favor. Our assessment here relies on our analysis for the first and seventh appellate issues as to this point.

In conclusion, we find that Appellant has failed to meet his burden to demonstrate that any error from the circuit trial counsel's reference to Mil. R. Evid. 404(b) evidence resulted in material prejudice to a substantial right. After considering trial counsel's comments as a whole, we are confident that Appellant was convicted based on the evidence alone.

### c. Using Gender-Based Hypotheticals

As there was no objection, we review this claim for plain error.

Appellant contends that the circuit trial counsel asked the members three times to think about the facts as though this were a male-on-female sexual assault allegation. According to Appellant, the gender of an accused and victim "should not affect the analysis" and "[p]erhaps this was the [circuit trial counsel]'s point, but it was made so crudely that the members *may have* received a different message." (Emphasis added). While Appellant claims that "[i]t is deeply problematic for trial counsel to hatch gender-based hypotheticals to illustrate a point," he does not provide any legal authority for this position.

This court has addressed the same argument hypothetical concerning the genders of an appellant and victim. *See United States v. Emas*, No. ACM 40020, 2022 CCA LEXIS 373, *48–50 (A.F. Ct. Crim. App. 21 Jun. 2022) (unpub. op.), *rev. denied*, 83 M.J. 73 (C.A.A.F. 2022). We agree with the analysis in *Emas*. "[W]e are at a loss to understand, how Appellant's conduct would be any more or less criminal by virtue of the gender of his victim." *Id.* at *49. Upon considering the argument viewed within the context of the entire court-martial, we conclude that Appellant has not met his burden in persuading this court that there was error. However, even if we were to find that this was error and that it was obvious, Appellant does not argue actual prejudice and we find no prejudice because, as a matter of law, the consent standard does not fluctuate based upon gender. He states the argument "was a gratuitous argument that would only serve to mislead the members." We do not agree as we do not find sufficient support in the record that discussing gender would mislead the members. As such, Appellant cannot show a reasonable probability that he would not have been convicted in the absence of this argument.

### d. Give Meaning to CS's Year

As there was an objection, we review this claim for abuse of discretion.

Appellant claims the military judge abused his discretion in overruling trial defense counsel's objection to circuit trial counsel's argument that CS left the panel with "the charge of doing the right thing, to give meaning to his year and to convict [Appellant]." The objection to the argument was "that's an improper argument," and the military judge summarily overruled the objection.

We agree with Appellant and find the military judge abused his discretion. There was nothing relevant about the argument for findings. As such, this was error, and the error was obvious. Therefore, we must test for prejudice. As explained above, we use the three *Fletcher* factors to weigh the prejudicial effect of improper argument.

First, the severity of the misconduct, was low. We do not find that one sentence at issue, compared to the entire closing argument, to be material or severe. While not relevant, it was one sentence in pages and pages of closing and rebuttal closing argument. The argument did not continue after the objection even though the military judge overruled the objection. Counsel's very next statement was, "And based on what you know, what you've heard, and what you've seen, to convict [Appellant] of what he's done." Counsel's argument finished there.

Second, as the military judge overruled the objection, there were no measures adopted to cure the misconduct.

Third, the weight of the evidence supporting the conviction was high. The record shows that CS told Appellant that he was not interested in him sexually on more than one occasion. CS spoke to Appellant to clear the air between the two of them, but also to make sure Appellant understood that he was not interested in men. Nonetheless, Appellant performed oral sex on CS and CS tried to push Appellant's head away from him to no avail.

Here, this improper argument by a trial counsel will not require reversal because circuit trial counsel's comments, taken as a whole, were not so damaging that we cannot be confident that the members convicted Appellant on the basis of the evidence alone. Therefore, we conclude that while the military judge abused his discretion, there was no prejudice.

## D. Convening Authority's Jurisdiction Over Appellant

Appellant argues that the convening authority, a member of the Space Force, did not properly exercise jurisdiction over Appellant, a member of the Air Force. He also argues, as an alternative, that the transfer of the referred charges to a parallel convening authority failed because the previous

convening authority transferred these charges to a convening authority that did not exist.

### 1. Additional Background

The National Defense Authorization Act for Fiscal Year 2020 (FY20 NDAA) redesignated the United States Air Force Space Command (AFSPC) as the United States Space Force (USSF), a separate armed service within the Department of the Air Force, effective 20 December 2019. *See* Pub. L. No. 116-92, §§ 952–53, 133 Stat. 1198, 1561–64 (2019); *see also* 10 U.S.C. § 9081.

Major General (Maj Gen) John E. Shaw, the then-commander of the United States Air Force (USAF) Space Operations Command (USAF SpOC; formerly the Fourteenth Air Force at Vandenberg AFB, California) referred this case to a general court-martial on 31 March 2020. On 19 October 2020, Maj Gen Shaw signed a transfer of authority memorandum for this case pursuant to R.C.M. 601(g) and Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, ¶ 9.5 (30 Oct. 2019). The memorandum explained that in accordance with Secretarial guidance and in anticipation of USAF SpOC being disestablished as a unit, Maj Gen Shaw was transferring this court-martial to the commander of the USSF Space Operations Command (USSF SpOC FIELDCOM at Peterson Space Force Base (SFB), Colorado). The memorandum identified the USSF SpOC commander as a parallel convening authority having general court-martial jurisdiction within the broader Department of the Air Force and that the transfer of authority would become effective upon the establishment of the new FIELDCOM.

On 20 October 2020, the Secretary of the Air Force issued a memorandum entitled *United States Space Force and United States Air Force Space Delta and Garrison Convening Authority Designations*, which designated the USAF SpOC commander a general court-martial convening authority and stated that USSF SpOC was the successor organization. It also explained that commanders of units which had not yet organizationally aligned within the United States Space Force would assume their convening authority status upon the latter of the date that the organizational change occurred or the date of the Secretary's memorandum.

The USAF SpOC was inactivated on 20 October 2020 and re-designated the USSF SpOC, a field command at Peterson SFB. The commander of the newly designated USSF SpOC, Lieutenant General (Lt Gen) Stephen N. Whiting, accepted Maj Gen Shaw's 19 October 2020 transfer of this court-martial on 23 October 2020.

At trial, the Defense objected to the transfer of charges from Maj Gen Shaw to Lt Gen Whiting. The Defense argued that the transfer was not conducted in accordance with R.C.M. 601(g). This issue was litigated at Appellant's court-

martial. After both sides briefed the issue, the military judge made findings of fact and conclusions of law. The military judge found "that the transfer of charges from Maj Gen Shaw to Lt Gen Whiting was an authorized transmittal of charges between parallel convening authorities and [did] not negate the jurisdiction of th[e] court-martial."

### 2. Law

This court reviews questions of jurisdiction de novo. *United States v. Harmon*, 63 M.J. 98, 101 (C.A.A.F. 2006) (citation omitted). We also review questions of statutory and regulatory interpretation de novo. *United States v. Atchak*, 75 M.J. 193, 195 (C.A.A.F. 2016) (citation omitted). "When challenged at trial, the prosecution must prove jurisdiction by a preponderance of evidence." *United States v. Hennis*, 79 M.J. 370, 374–75 (C.A.A.F. 2020) (footnote, internal quotation marks and citation omitted).

"Jurisdiction depends upon a properly convened court, composed of qualified members chosen by a proper convening authority, and with charges properly referred." *United States v. Adams*, 66 M.J. 255, 258 (C.A.A.F. 2008) (citations omitted). "When charges are referred to a court-martial, that court retains jurisdiction over the case from the point of referral through authentication of the record by the military judge, except when the convening authority withdraws the charges from the court-martial under R.C.M. 604(a)." *United States v. Williams*, 55 M.J. 302, 304 (C.A.A.F. 2001) (citation omitted).

"An accused should not ordinarily be tried by a court-martial convened by a member of a different armed force except when the circumstances described in [subparagraphs (e)(2)](A) or (B) exist. However, failure to comply with this policy does not affect an otherwise valid referral." R.C.M. 201(e)(3)(B). Rule for Courts-Martial 601(g) states,

> If it is impracticable for the original convening authority to continue exercising authority over the charges, the convening authority may cause the charges, even if referred, to be transmitted to a parallel convening authority. This transmittal must be in writing and in accordance with such regulations as the Secretary concerned may prescribe. Subsequent actions taken by the parallel convening authority are within the sole discretion of that convening authority.

*See also* AFI 51-201, ¶ 9.5 (citing the same language from R.C.M. 601(g)). A parallel convening authority is "defined as a convening authority of the same level." *Id.*

"Unless otherwise limited by superior competent authority, general courts-martial may be convened by . . . any commander designated by the Secretary concerned or empowered by the President." R.C.M. 504(b)(1). "Under

regulations prescribed by the Secretary concerned, a commissioned officer commanding for the time being, a successor in command, or any person exercising general court-martial jurisdiction may act under this section in place of the convening authority." Article 60b(a)(5), UCMJ, 10 U.S.C. § 860b(a)(5)

### 3. Analysis

Appellant makes two arguments concerning jurisdiction. First, he claims that the convening authority was a member of the Space Force while Appellant was a member of the Air Force, thus based on R.C.M. 201(e)(3), the court-martial lacked jurisdiction. Second, Appellant argues that the transfer of convening authority "broke the chain of jurisdiction, divesting the court-martial of jurisdiction" because "[w]hen Maj Gen [Shaw] attempted to transfer to a parallel convening authority, that authority did not exist." Appellant contends that transferring to a non-existent convening authority means there was, for a period of four days, no convening authority responsible for the referred charges and this invalidated the prior referral. As outlined below, we disagree with both arguments.

As to Appellant's R.C.M. 201 argument, he claims that because the circumstances described in subparagraphs (e)(2)(A) or (B) of the Rule do not apply, jurisdiction does not apply. We agree with Appellant that the two exceptions: (1) commanders of a unified or specified combatant command and (2) commanding officer of a joint command or joint task force do not apply. However, Appellant's argument fails because the Rule itself explains that "failure to comply with this policy does not affect an otherwise valid referral." R.C.M. 201(e)(3)(B). Here, Appellant does not claim that the referral was otherwise invalid.

As to Appellant's second argument, that a gap of four days means that there was no parallel command to transfer to, we are unconvinced.

This court has reviewed a similar issue. *United States v. Prescott*, No. ACM 39931, 2022 CCA LEXIS 205, at *79 (A.F. Ct. Crim. App. 1 Apr. 2022) (unpub. op.), *rev. denied*, 83 M.J. 93 (C.A.A.F. 2022). In *Prescott* this court noted that:

> The basic flaw in Appellant's argument is that jurisdiction is not predicated on the continuous existence of the convening authority that originally convened the court, or of any particular [general court-martial convening authority]. Instead, the UCMJ relies upon actors with appropriate authority taking actions at the relevant point in time.

*Id*. Here, just like in *Prescott*, Appellant's court-martial was properly convened and, as the military judge correctly concluded, the Appellant's "position ignores the wording of the transfer, seeks to have this Court institute an unreasonable

application of the rules and builds in a timing requirement that is not present in the wording of Rule for Court[s]-Martial 601(g) or AFI 51-201." Both Lt Gen Whiting and Maj Gen Shaw were both valid general court-martial convening authorities.

We conclude, as did the military judge, that on 19 October 2020, while still operating in his status as a general court-martial convening authority, Maj Gen Shaw appropriately initiated a transfer of Appellant's court-martial to another general court-martial convening authority, which he knew would be created by subsequent Secretarial action two days later on 21 October 2020. We find this to be an appropriate transfer of parallel convening authority jurisdiction because Maj Gen Shaw initiated the transfer of authority for this case while he was still a general court-martial convening authority, and ultimately transferred this case to a general court-martial convening authority created two days later. As such, his actions complied with R.C.M. 601(g) and AFI 51-201, ¶ 9.5.

Applying de novo standard to the question of jurisdiction, we find against Appellant.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. *See* Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court